## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

NORTHEAST COATING
TECHNOLOGIES, Inc.

                Plaintiff,

                v.

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES;

Kirt THOMPSON, in his Official Capacity,
Director of the Texas Service Center, U.S.
Citizenship and Immigration Services, U.S.
Department of Homeland Security;

                Defendants.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND REVIEW OF AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT

### INTRODUCTION

1.  It is difficult to conceive of a better candidate for a "specialized knowledge" intracompany transferee or L-1B visa than Mr. Yassine Aoujil ("Mr. Aoujil"), a French vacuum technology and materials treatment expert whom the Plaintiff, NORTHEAST COATING TECHNOLOGIES, Inc., ("NCT" or Plaintiff) seeks to employ as Coating Technician at its factory in Kennebunk, Maine. NCT provides highly technical and complex business-to-business engineering solutions—specifically, coating and related services—that improve the performance of industrial and automotive components.

2.  Mr. Aoujil worked for three years in France at NCT affiliate, Institut de Recherches en Ingenierie des Surfaces SAS ("IREIS"), receiving extensive training on and ultimately mastering its proprietary machinery, becoming one of a small handful of employees among IREIS and

NCT's mutual parent company HEF SAS's ("HEF Group") 2,500-person workforce who can administer its complex coating process, from start to finish. This is why the U.S. Department of State granted NCT's application for an L-1B visa for Mr. Aoujil, which enabled him to travel to the United States and work for Plaintiff for approximately three years.

3. But when it came time to extend Mr. Aoujil's L-1B nonimmigrant status, Defendants, U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS") and its Texas Service Center Director, Kirt THOMPSON, denied NCT's petition, ignoring not only the State Department's approval of Mr. Aoujil's previous application on the same facts but also voluminous evidence submitted by Plaintiff clearly establishing that Mr. Aoujil qualified for and merited an extension of his L-1B nonimmigrant status. What is more, USCIS's denial was an unexplained departure from its own previous decision-making, having approved numerous petitions filed by NCT and other employers for similarly-situated employees.

4. Harmed by the loss of Mr. Aoujil's specialized knowledge, NCT brings this action challenging Defendants' unlawful denial of NCT's petition to extend Mr. Aoujil's L-1B nonimmigrant status.

5. Because Defendants' action violates the Immigration and Nationality Act ("INA") and the Administrative Procedure Act ("APA"), it should be vacated and set aside.

## THE PARTIES

**Plaintiff**

6. Plaintiff NORTHEAST COATING TECHNOLOGIES, Inc. ("NCT"), is a corporation organized under the laws of Maine with its principal place of business in Kennebunk, Maine. NCT provides highly technical and complex business-to-business engineering solutions—specifically, coating and related services—that improve the performance of industrial and

automotive components. NCT employs approximately 115 employees and generates gross annual income of approximately $7 million. NCT is a subsidiary of Techniques Surfaces Holdings SAS, which is in turn owned by HEF SAS ("HEF Group"), headquartered in France. HEF Group is a global leader in surface engineering and the science of tribology (the study of friction, wear, lubrication, and the design of bearings) for over 50 years.

7. On March 22, 2021, USCIS denied NCT's Form I-129, Petition for Nonimmigrant Worker, filed on behalf of beneficiary Mr. Yassine Aoujil. At the time NCT filed Form I-129 on behalf of Mr. Aoujil, he was physically present in the United States.

**Defendants**

8. Defendant U.S. CITIZENSHIP AND IMMIGRATION SERVICES is a federal agency of the United States. It is charged with adjudication of petitions for extension of L-1B nonimmigrant status filed by noncitizens physically present in the United States. 8 C.F.R. §§ 214.2(l)(1)(i), 214.2(l)(5)(i).

9. Defendant Kirt THOMPSON is the Director of the USCIS Texas Service Center. In that capacity, he is charged with the adjudication of applications and petitions for immigrant and nonimmigrant statuses, including the petition for L-1B nonimmigrant status Plaintiff NTC filed on behalf of Mr. Yassine Aoujil. Defendant Thompson is sued in his official capacity.

## JURISDICTION AND VENUE

10. This court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. Plaintiff is a person aggrieved by a final agency action issued by Defendants. *See* 5 U.S.C. §

702. Plaintiff brings this suit for declaratory and injunctive relief to set aside Defendants' action as contrary to law and arbitrary and capricious, *see id*. §§ 705, 706, presenting a federal question.

11. Venue is proper in this Court because Plaintiff resides in this District and no real property is involved. 28 U.S.C. § 1391(e)(1).

12. Plaintiff has standing to bring this case.

13. Plaintiff is injured by Defendants' wrongful denial of its petition for Mr. Aoujil, because it has caused them great financial harm. Defendants' decision deprives Plaintiff of a qualified and valued employee whose absence causes Plaintiff to suffer a marketplace disadvantage against competing coating companies.

## LEGAL BACKGROUND

14. The Immigration and Nationality Act ("INA"), as amended, provides for the admission of certain categories of employees of multinational companies from their foreign operations to their operations in the United States. 8 U.S.C. § 1101(a)(15)(L). Such noncitizens can be admitted as "intracompany transferees" and are issued L-1 visas.  There are two such types of intracompany transferee visa classifications: The L-1A classification for corporate managers and executives, and the L-1B classification for employees who possess "specialized knowledge." USCIS Policy Memorandum, L-1B Adjudications Policy, PM-602-0111, Aug. 17, 2015, https://www.uscis.gov/sites/default/files/document/memos/L-1B_Memorandum_8_14_15_draft_for_FINAL_4pmAPPROVED.pdf (hereinafter "L-1B Memo"). The L-1 visa is the means by which multinational businesses—like NCT's parent

company, the HEF Group—temporarily transfer foreign employees to their American operations. Plaintiff's petition for Mr. Aoujil, which is at the heart of this lawsuit, sought L-1*B* classification.

15. Congress created the "L-1" visa in 1970 by amending the Immigration and Naturalization Act of 1952 to enable multinational corporations to transfer to their U.S. operations foreign personnel employed in a "capacity ... involving specialized knowledge."[1] *See* Pub. L. No. 91-225 (Apr. 7, 1970) (the "1970 Act"). The statutory framework from 1970 remains basically unchanged today.

16. The law provides a visa for a noncitizen:

> who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof *in a capacity that* is managerial, executive, or *involves specialized knowledge,* and the alien spouse and minor children of any such alien if accompanying him or following to join him.

*See* 8 U.S.C § 1101(a)(15)(L).

17.  Congress did not define "specialized knowledge" in the 1970 Act. Legacy Immigration and Naturalization Service ("INS") therefore filled the vacuum with its own interpretation. The INS chose to construe the statutory term "specialized knowledge" narrowly, relying on the 1970 Act's legislative history indicating that the "'L' category will not be large" and that the class "is narrowly drawn and will be carefully regulated." H. Rep. 91-851 (Feb. 24, 1970), *reprinted in* 1970 U.S.C.C.A.N. 2750, 2754.

---

[1] Congress perceived that "existing law restricts and inhibits the ability of international companies to bring into the U.S. foreign nationals with management, professional, and specialist skills." H. Rep. 91-851 (Feb. 24, 1970), reprinted in 1970 U.S.C.C.A.N. 2750, 2751.

18. In 1987, the INS promulgated a regulatory definition of "specialized knowledge" that effectuated this narrow construction by (i) imposing a "US labor market test," and (ii) requiring that transferees have "propriety knowledge" of the company product or service. 52 Fed. Reg. 5738, 5752 (Feb. 26, 1987) at 8 C.F.R. § 214.2(l)(l)(ii)(D).

19. The agency's restrictive requirements were short-lived. In 1990, Congress provided its own statutory definition of "specialized knowledge" in the Immigration Act of 1990 (the "1990 Act"), P.L. 101-649 (Nov. 29, 1990), 104 Stat. 5023 at § 206(b)(2)(B). Congress' new definition broadened the standard by expressly rejecting the above-mentioned "proprietary knowledge" and "U.S. labor market" requirements - without imposing any new tests or restrictions to offset these deletions. *Id.* Rather, the new 1990 statutory definition—which remains the standard today— provides for one of two alternative showings of "specialized knowledge":

> [A noncitizen] *is considered* to be serving in a capacity involving specialized knowledge with respect to a company **if** the [noncitizen] has a special knowledge of *the company product and its application in international markets* **or** *has an advanced level of knowledge of processes and procedures of the company.*

*Id.;* 8 U.S.C. § 1184(c)(2)(B) (emphasis added).

20. In response, the INS in 1991 issued new implementing regulations. The regulatory Preamble explicitly acknowledged Congress' intent behind the 1990 Act:

> **The intent of [the 1990 Act] as** it relates to the L classification **was to broaden its utility for international companies. To comply with Congressional intent,** this proposed rule adopts the more liberal definition of manager and executive now specified in section 101(a)(44)(A) and (B) of the Act ..... The L regulations have also been modified to include *a more* **liberal** *interpretation* of specialized knowledge defined in section 214(c)(2)(B) of the Act.

56 Fed. Reg. 31553, 31554 (July 11, 1991) (emphasis added).

21. The resulting INS regulatory definition—still valid today—closely mirrors Congress' expanded definition:

> 'Specialized knowledge' means special knowledge possessed by an individual of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets, or an advanced level of knowledge or expertise in the organization's process and procedures.

*Id*. at 31564 (Proposed). This definition was adopted without change at 56 Fed. Reg. 61111, 61128 (Dec. 2, 1991); 8 C.F.R. § 214.2(1)(l)(ii)(D).

22. Following promulgation of the above regulation, INS and later USCIS issued a series of memoranda to clarify the meaning of specialized knowledge. Memorandum of James A. Puleo, Acting Executive Associate Commissioner, Office of Operations, INS, "Interpretation of Specialized Knowledge (CO 214LP)" (Mar. 9, 1994); Memorandum of Fujie Ohata, Associate Commissioner, Service Center Operations, INS, "Interpretation of Specialized Knowledge (HQSCOPS 70/6.1)" (Dec. 20, 2002); and Memorandum of Fujie Ohata, Director, Service Center Operations, USCIS, "Interpretation of Specialized Knowledge for Chefs and Specialty Cooks Seeking L-1B Status" (Sept. 9, 2004).

23. In 2015, USCIS issued the L-1B Memo, which rescinded these memoranda and provided consolidated guidance concerning the meaning of "specialized knowledge." L-1B Memo at 5. The L-1B Memo "sets forth USCIS policy regarding the L-1B classification for workers with specialized knowledge." *Id*. at 2. It applies to L-1B "petitions pending or filed with USCIS on or after August 31, 2015." *Id*.

24. Looking to their dictionary definitions, USCIS distinguishes between special and advanced knowledge as follows:

> special knowledge, which is knowledge of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets that is distinct or uncommon in comparison to that generally found in the particular industry; or

advanced knowledge, which is knowledge of or expertise in the petitioning
organization's specific processes and procedures that is not commonly found in
the relevant industry and is greatly developed or further along in progress,
complexity and understanding than that generally found within the employer.

*Id*. at 7.

25. Factors that may be considered in determining whether knowledge is specialized include:
(1) whether the beneficiary's knowledge normally can be gained only through prior experience
with the petitioning organization; (2) whether the knowledge can be easily transferred or taught
to another individual without significant economic cost or inconvenience; and (3) whether the
knowledge is of a process or product that is sophisticated or complex. *Id*. at 8. In evaluating
claims of specialized knowledge, USCIS will look to—among other things—documentation of
training, work experience, or education; evidence of impact the transfer would have on the
petitioning organizations U.S. operations; in-house training records; and contracts, statements of
work, or other documentation showing that the beneficiary possesses knowledge that is
particularly beneficial to the organization's competitiveness in the marketplace. *Id*. at 12.

## FACTUAL BACKGROUND

**In 2017, the U.S. Department of State Issued Mr. Aoujil an L-1B Visa to Work as a Coating Technician for NCT**

26. Following a visa interview, U.S. Embassy Paris issued Mr. Aoujil an L-1 visa on October
6, 2017 based on a petition filed by NCT seeking to employ him at its facility in Kennebunk,
Maine. The petition stated that Mr. Aoujil would be employed as a Coating Technician.

27. U.S. consular officers are "responsible for verifying the qualifications of applicants for L
classification" in cases like Mr. Aoujil's. 9 Foreign Affairs Manual 402.12-7(B) ("FAM"). Such
visas cannot be approved unless the consular officer is satisfied that the application is "clearly
approvable." 9 FAM 402.12-7(E). Credible documentation must establish that: the applicant has

been continuously employed full-time by a qualifying entity for at least one year within the three years immediately preceding the visa application; the applicant was rendering services in a capacity that involves specialized knowledge through that year; and that the applicant is destined to render services in such a capacity. *Id.* "Any doubt whether an applicant has fulfilled his or her burden of proof" requires denial of the application. *Id.*

28. Shortly after the L-1 visa was issued, on or about October 30, 2017, Mr. Aoujil relocated to Maine and began working for NCT.

**NCT Petitions to Extend Mr. Aoujil's L-1B Status to Continue his Employment as a Coating Technician**

29. On August 4, 2020, following a nearly-three-year stretch during which Mr. Aoujil was a valued employee of NCT, Plaintiff filed with USCIS a Form I-129, Petition for Nonimmigrant Worker, along with a suite forms and supporting documents (altogether "L-1B Extension Petition"). The purpose was to extend Mr. Aoujil's L-1B nonimmigrant status so that he could continue to work for NCT as a Coating Technician through August 2022.

30. The L-1B Extension Petition was accompanied by a letter from NCT's president, Shawn Spencer ("First Spencer Letter"). The First Spencer Letter explained that Mr. Aoujil's job duties included "temporary engineering level development and implementation of proprietary advanced coating systems and processes into NCT products, for U.S. customers, to ensure final products meet customer requirements for cost and quality; utiliz[ing the company's] Physical Vapor Deposition (PVD) machine to develop multilayer wear resistant coatings for functional and decorative applications, including PVD Coating, Plasma Ion Nitriding, [and] Salt Bath Nitriding Kolen QPQ; work[ing] with peer engineers to ensure final product quality and production optimization targets; develop[ing] recipes for treatment in a PVD production line;" and other responsibilities. According to the First Spencer Letter, Mr. Aoujil will "continue to utilize his

proprietary knowledge of [the] Diamond Like Coating process developed by HEF in France." It is this "in-depth knowledge of [NCT's] metal coating process and products" that "makes [Mr. Aoujil's] knowledge specialized and is the reason" NCT seeks to employ him as a Coating Technician.

31. The First Spencer Letter states that Mr. Aoujil worked from March 2014 to October 2017 as an R&D Technician with IREIS SAS Group in France, an affiliate of NCT. There, he was responsible for similar duties to those required of the Coating Technician position. Mr. Aoujil is "uniquely qualified for the position of Coating Technician," according to the First Spencer Letter, because of his specialized knowledge of the Diamond Like Coating process and company systems from IREIS SAS that are implemented at NCT facilities. The First Spencer Letter provides that Mr. Aoujil's on-the-ground experience with IREIS SAS, coupled with his degree in Vacuum Technology and Materials Treatment from Institut Universitaire de Technologie Saint-Etienne, make him an ideal candidate for the Coating Technician position at NCT.

32. The L-1B Extension Petition included documents corroborating Mr. Spencer's claims regarding Mr. Aoujil's educational background and employment history with NCT and its affiliates.

**USCIS Issues a Request for Evidence**

33. On November 23, 2020, USCIS issued NCT a Request for Evidence ("RFE").

34. The RFE homed in on several perceived deficiencies in NCT's L-1B Extension Petition.

35. First, USCIS asserted that NCT had submitted insufficient evidence to demonstrate that Mr. Aoujil was continuously employed with an NCT affiliate for one year within the preceding three-year period. Relatedly, USCIS asserted that there was insufficient evidence that Mr. Aoujil was employed abroad in a specialized knowledge position. The RFE provides that NCT could

satisfy this criterion by submitting evidence such as: copies of Mr. Aoujil's training, pay or personnel records; an organizational chart showing the foreign entity's structure and staffing levels and clearly identifying Mr. Aoujil's position in the chart; a list of employees in Mr. Aoujil's division by name, job title, summary of duties, education level, and salary; a letter from an authorized representative of the foreign entity describing the specialized knowledge duties of Mr. Aoujil's position abroad that describes, among other things, the percentage of time spent on each duty; and any other relevant evidence to support the claims made in the Spencer Letter.

36. Second, the RFE posits that NCT's L-1B Extension Petition contained insufficient evidence that Mr. Aoujil possesses specialized knowledge and that his education, training, and employment qualify him to perform the role of Coating Technician for NCT. The RFE instructs NCT to submit evidence of Mr. Aoujil's education, training and employment along with an explanation of how it relates to his claimed specialized knowledge; a description of his knowledge or expertise and why it is specialized, along with a request that NCT identify his knowledge as either "special" and/or "advanced"; and a comparison of his knowledge to that of other employees and workers in his field. The RFE states that other evidence NCT may submit includes, but is not limited to, documentation of training, work experiences, or education establishing the number of years Mr. Aoujil has been using or developing his claimed specialized knowledge; evidence of the impact, if any, his transfer would have NCT's operations; and evidence Mr. Aoujil is qualified to contribute to NCT's knowledge of foreign operating conditions as a result of knowledge not generally found within NCT.

37. Third, the RFE asserts that NCT submitted insufficient evidence to demonstrate that the position of Coating Technician involves specialized knowledge. The RFE instructs NCT to submit a detailed description of the services to be performed, including information such as the

specific nature of the industry or field involved, the nature of NCT's products or services, the

nature of the specialized knowledge required to perform the duties of Coating Technician, and

NCT's need for Mr. Aoujil's specialized knowledge. The RFE provides that NCT's evidence

may also including information concerning the percentage of time spent on each duty.

**NCT Responds to the Request for Evidence**

38. On March 12, 2021, Plaintiff filed a timely response to the RFE ("RFE Response"). The

RFE Response contained fourteen exhibits addressing each and every alleged deficiency

identified by USCIS. Critical documents included: pay statements for Mr. Aoujil from October

2016 to October 2017, demonstrating his employment for IREIS, NCT's affiliate; an additional

letter of support from Mr. Spencer of NCT ("Second Spencer Letter"); an organizational chart of

NCT; a letter of support from C. Pupier, president of IREIS, Mr. Aoujil's former employer

("Pupier Letter"); an organizational chart for IREIS from January 2015; copies of Mr. Aoujil's

degrees and professional licenses; a letter from IREIS's Tribology Department Manager

concerning Mr. Aoujil's training and experience under his supervision ("Tribology Department

Letter"); certificates corroborating trainings on tribology that Mr. Aoujil received during his

employment with IREIS; an explanation of HEF Group's tribological coating procedures along

with training materials; and NCT company product information.

39. The Second Spencer Letter spans some 18 pages and covers a range of topics raised in

the RFE, including information about the HEF Group and its area of expertise, tribology, the

Coating Technician role at NCT, and Mr. Aoujil's expertise and background. The letter includes

an expansive discussion of the highly technical role of Coating Technician at NCT.

40. The Second Spencer Letter opens by succinctly articulating precisely how few people

there are on this planet who can do what Mr. Aoujil does at NCT:

Mr. Aoujil is uniquely qualified [for the Coating Technician position] in that he performed the development of coating recpies and machine tooling for the [Physical Vapor Deposition – PVD] machines currently in use by NCT while employed in France at our affiliate, [IREIS]. Of the 2,500 HEF Group employees worldwide, there are less than 12 individuals who perform similar duties to those which Mr. Aoujil performed in France. Of those 12 individuals, 5 are located in France where Mr. Aoujil was employed. However, as mentioned, Mr. Aoujil developed the coating recipes and machine tooling for the PVD machines while in France, before the machines were shipped to NCT. Therefore, there are no comparable individuals at IREIS and NCT that can perform his duties. The reason for the limited number of professionals who could perform these duties is because the position encompasses the entire process. For example, we have more coating 'recipe' experts, more machine development experts, and custom application experts. It is the combination of all of these areas, and the pre-production development he has performed on the specific HEF PVD machines[,] which makes Mr. Aoujil unique.

41. The Spencer Letter extensively describes the specialized knowledge Mr. Aoujil brought to bear to NCT, including an advanced understanding and background in Tribology; expertise in the HEF Group's Salt Bath Nitriding process to develop multilayer wear resistant coatings; knowledge of the HEF Group's Plasma Nitriding process which is required to develop multilayer wear resistant coatings; expertise in the HEF Group's patented CAM (Coating Assisted by Microwaves) technology; knowledge concerning the high energy sputtering process developed by the HEF Group called Plasma Enhanced Magnetron Sputterings (PEMS); and extensive expert-level knowledge of the HEF Group's patented technology combining the Physical Vapor Deposition and the Plasma-assisted Chemical Vapor Deposition processes.

42. The Spencer Letter concludes as follows:

…knowledge of chemical and mechanical engineering, as well as a detailed knowledge of HEF Group proprietary processes and machines are required to perform Mr. Aoujil's Coating Technician role. Other companies in the US do have PVD coatings. Bu the HEF Group does not sell its machines to any company outside of the HEF Group, so only our technicians know how to set them up, use them, and train other employees. It is in this capacity that we are in continued need of Mr. Aoujil's key expertise and specialized knowledge of HEF-developed products (machines), and how the machines can apply different chemical 'recipes' onto our customers' different materials (processes).

There are no employees at NCT in the United States that can be trained at this time to perform the specific duties required of the Coating Technician position held by Mr. Aoujil. This knowledge requires 18-24 months of training on the HEF machines that are manufactured in France and shipped to the United States. HEF does not sell its coating machines, made in France, to other companies and HEF does not sell its proprietary coating processes and coating recipes to other companies. Because the machines, processes and recipes used to perform the coating are proprietary and unique, there are no other Coating Technicians outside of the HEF [Group] to compare and contrast against.

43. The Pupier Letter addresses Mr. Aoujil's duties at IREIS in France and provides information about the unique PVD machines, processes and coating technology developed in France for use by IREIS's affiliate, NCT. It explains that NCT has leased 14 PVD machines from HEF Group in France, each machine being valued at over $900,000. These machines are "highly complex and apply uniform coatings and alloys onto our customers' products, such as automotive and industrial components." According to the Pupier Letter, getting these different materials coated demands "a detailed knowledge of chemical and mechanical engineering, as well as a detailed knowledge of [HEF Group's] proprietary machines and processes…." The Pupier letter proceeds to provide a breakdown of Mr. Aoujil's responsibilities—and percentage of time spent per duty—when he held the title of Research & Development Technician for IREIS. The Pupier Letter goes on to assert that no other employees within the HEF Group would be able to serve as a Coating Technician for NCT because the machines NCT uses are the very same machines that Mr. Aoujil alone tooled and developed coating recipes for while at IREIS.[2] The Pupier Letter provides that Mr. Aoujil "acquired his specialized knowledge of HEF's

---

[2] Industrial engineers not trained within the HEF Group would fare no better, because the HEF Group "does not sell its machines to any company outside of the HEF Group, so only [HEF Group] engineers and technicians know how to set them up, use them, and train other HEF employees." Pupier Letter at 3.

proprietary machines, processes, and coating recipes primarily through on the job training in France."

44. The Tribology Department Letter confirms that Mr. Aoujil received detailed on-the-job training for six months in 2014, during which time Dr. Yves Gachon, the manager of IREIS's Tribology Department, supervised Mr. Aoujil. According to the Tribology Department Letter, Mr. Aoujil received training and acquired experience with performing various tribological tests; examining and characterizing materials using optical microscopy, Scanning Electron Microscopy and Electron Dispersive X-ray analysis; identifying various damage processes on real components or on test samples; maintaining operations on test machines and Scanning Electron Microscopes; and calibrating sensors.

**USCIS Denies NCT's L-1B Extension Petition**

45. On March 22, 2021, USCIS issued a decision denying NCT's L-1B Extension Petition (the "Decision"). The Decision rests on three principal determinations.

46. First, USCIS determined that NCT failed to establish that Mr. Aoujil had been employed abroad in a position that involved specialized knowledge. According to the Decision, NCT "failed to provide any evidence to support how [Mr. Aoujil's] level of knowledge distinguishes him from the others with[in the HEF Group] or in the industry or how [his] training is different from other employees assigned to these projects and internal processes." The Decision states that the record "does not include sufficient information to establish that [Mr. Aoujil's] development of 'coating recipes and machine tooling for the Physical Vapor Deposition (PVD) machines' represents the use of special or advanced knowledge, relative to the knowledge typically required by comparable position [*sic*.] within [the HEF Group] or the industry as a whole." The Decision further asserts that NCT did not "provide[] evidence demonstrating the amount of training

15

received by [Mr. Aoujil]" or evidence that his training was "'extensive' or considered specialized or advanced." The Decision further faults NCT for failing to provide "evidence indicating the number of other employees who have received the same training as the beneficiary" and for not providing "a comparison of the beneficiary's training and experience to others in the field or within the organization."

47. Second, USCIS determined that the L-1B Extension Petition fails to establish that Mr. Aoujil is "qualified to perform the intended services in the United States." According to USCIS, NCT did not provide "any documentary evidence to corroborate [Mr. Aoujil's] duties, skills or knowledge." The Decision provides that the record lacks "documentary evidence as to whether [Mr. Aoujil's] experience and knowledge was uncommon, complex or different than similarly situated individuals in [the] industry or organization." The Decision claims that NCT did not provide a "comparison of [Mr. Aoujil's] knowledge against others holding comparable positions in the industry" or evidence demonstrating that Mr. Aoujil's duties abroad involved specialized knowledge. The Decision discounts NCT's claims that Mr. Aoujil received extensive, advanced and customized training regarding HEF Group's proprietary methodologies and tools, because, according to USCIS, "insider knowledge of a company's tools and methodologies does not appear to be unusual for the beneficiary to possess and is not indicative of the beneficiary's claimed specialized expertise."

48. Third, USCIS determined that the position of Coating Technician does not involve specialized knowledge. The Decision states that the evidence NCT submitted "is insufficient to establish that [Mr. Aoujil]'s knowledge of [NCT]'s processes and/or procedures is 'special' or 'advanced,' in relation to other employees or that the beneficiary's knowledge may differentiated [*sic*.] in any way from that used in similar positions in the industry." According to USCIS,

"[i]nsider knowledge of a company's operations does not automatically constitute special or advance knowledge[]" and "[i]t is expected that job training at any company would provide an employee with knowledge about the processes and procedures that may be unique to a company."

49. Approximately one week after USCIS denied NCT's L-1B Extension Petition, on March 31, 2021, Mr. Aoujil departed the United States.

**The Decision's Flaws**

50. The Decision ignores the robust record which clearly establishes that Mr. Aoujil's L-1B nonimmigrant status merited extension. Time and again, USCIS reached conclusions regarding the record that can only be reached by disregarding evidence NCT submitted. For example, USCIS's assertion that NCT "failed to provide any evidence to support how [Mr. Aoujil's] level of knowledge distinguishes him from the others with[in the HEF Group]" cannot be squared with the Pupier Letter and First and Second Spencer Letter, both of which make clear that Mr. Aoujil is one of the only employees among HEF Group's 2,500-person workforce—and thus the world—who is capable of administering the PVD process, soup to nuts, on the HEF Group's proprietary machines—the very same machines he trained on in France and that are now located at NCT's facility in Maine. Another example: USCIS asserts that NCT did not provide "any documentary evidence to corroborate [Mr. Aoujil's] duties, skills or knowledge[,]" when in fact the record contains voluminous evidence of Mr. Aoujil's educational and training background in the form of diplomas, licenses, as well as letters from his supervisors and other superiors concerning on-the-job training he received in his approximately three years of employment with IREIS.

51. The Decision is not in line with law or USCIS policy. For example, the L-1B Memo provides that an L-1B petitioner can carry his or her burden of demonstrating that a beneficiary's knowledge is specialized by demonstrating, *inter alia*, that the beneficiary "possesses knowledge of foreign operating conditions that is of significant value to the petitioning organization's U.S. operations[,]" that the beneficiary's "claimed specialized knowledge normally can be gained only through prior experience with the petitioning product[,]" or that the beneficiary has knowledge of a process or a product that either is sophisticated or complex, or of a highly technical nature[.]" According to the L-1B Memo, "[t]he presence of one or more of these (or similar) factors, when assessed in the totality of the circumstances, may be sufficient to establish by a preponderance of the evidence that a beneficiary has specialized knowledge." The record establishes that NCT met all these criteria, by demonstrating that Mr. Aoujil possesses unique skills that are essential to NCT's coating operations, that his expertise, which is so intimately intertwined with HEF Group's proprietary machines and processes, was acquired through years of on-the-ground experience with the HEF Group, and that the knowledge he brings to bear pertains to a process that is highly technical in nature.

52. The Decision is out of step with past agency practice. For years, USCIS has approved L-1B petitions filed by Plaintiff to employ coating experts with substantially similar credentials to Mr. Aoujil. Indeed, in recent years, USCIS has approved at least four L-1B petitions filed by NCT on behalf of coating experts—for Laurent Oliver, Laetitia Celle, Pierre Luc Bouchet, and Gregory Sebastien Dillou—enabling their intracompany transfer from NCT's affiliates abroad to NCT's facility in Kennebunk, Maine. In each of these L-1B petitions, NCT substantiated through documentary evidence that the coating expert works in a "specialized knowledge" capacity. These foreign nationals, like Mr. Aoujil, brought to bear a mix of academic and on-the-job

training through which they acquired the specialized knowledge necessary to perform their complex and highly technical work for NCT.

53. USCIS's Administrative Appeals Office ("AAO"), the agency appellate tribunal that hears appeals of L-1B denials, has issued decisions granting L-1B status to individuals like Mr. Aoujil.

## COUNT ONE
### Deprivation and Violation of Rights under the INA
### 8 U.S.C. 1101, et seq.

54. Plaintiff re-alleges and incorporates by reference herein all the allegations set forth above.

55. In denying NCT's petition to extend Mr. Aoujil's L-1B nonimmigrant status, Defendants unlawfully interpreted and applied the term "specialized knowledge" under 8 U.S.C. § 1101(a)(15)(L), including through the improper disregard of certain evidence and the imposition of an impermissibly high burden of proof on NCT. *Matter of Pazandeh*, 19 I&N Dec. 884 (BIA 1989).

56. As a result, Defendants deprived NCT of its rights under the INA to benefit from the statute's intracompany transferee provisions, and thereby violated those rights. 8 U.S.C. § 1101(a)(15)(L).

## COUNT TWO
### Violation of the Administrative Procedure Act
### 5 U.S.C. §701, et seq.

57. Plaintiff re-alleges and incorporates by reference herein all the allegations set forth above.

58. Defendants' denial of Plaintiff's petition on behalf of Mr. Aoujil is improper and reviewable under the APA. 5 U.S.C. § 702.

59. As a result of this improper decision by Defendants, Plaintiff is "suffering a legal wrong of agency action" and is "adversely affected or aggrieved by agency action," and therefore "is entitled to judicial review thereof." 5 U.S.C. § 702.

60. Defendants' decision to deny Plaintiff's L-1B visa petition was based upon an interpretation contrary to and inconsistent with 8 U.S.C. § 1101(a)(15)(L) and 8 C.F.R. § 214.2(l)(1)(ii)(D).

61. Defendants' decision to deny Plaintiff's petition on behalf of Mr. Aoujil—particularly in light of a record providing ample evidence of the "specialized knowledge" capacity of his employment—was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Although Plaintiff's petition for Mr. Aoujil is, in material respects, indistinguishable from petitions which Defendants previously approved, Defendants neither explained nor even acknowledged this change in its adjudication of this petition.

## PRAYER FOR RELIEF

NCT hereby prays for relief as follows:

(1)  Assume jurisdiction over this matter;

(2)  Hold unlawful and set aside USCIS's findings that the evidence fails to establish that Mr. Aoujil has been and will be employed in a "specialized knowledge" capacity;

(3)  Hold unlawful and set aside the USCIS decision denying NCT's petition on behalf of Mr. Aoujil as not in accordance with law;

(4)  Declare that NCT has submitted sufficient evidence to establish that Mr. Aoujil has been and will be employed in a "specialized knowledge" capacity, as set forth in INA § 101(a)(15)(L), 8 U.S.C. § 1101(a)(15)(L);

(5) Order Defendants to reopen and re-adjudicate Plaintiff's I-129 petition on behalf of Mr. Aoujil consistent with this Court's declaratory judgment;

(6) Grant reasonable attorneys' fees and costs as provided under the Equal Access to Justice Act and the APA;

(7)  Grant such further relief as the Court deems just and proper.


Dated: June 18, 2021                                      Respectfully submitted,


<u>/s/ Michael D. Traister</u>                                   *Thomas K. Ragland
Michael D. Traister                                      CLARK HILL PLC
MURRAY, PLUMB & MURRAY                  1001 Pennsylvania Ave. NW
75 Pearl St #300,                                        Suite 1300 South
Portland, ME 04101                                    Washington, DC 20004
Telephone: 207-773-5651                            Telephone: 202-552-2360
Fax number: 207-773-8023                          Fax Number: 202-552-2384
Email: mtraister@mpmlaw.com                   Email: TRagland@ClarkHill.com

                                                               *Moving for *pro hac vice* admission

                             *Attorneys for Plaintiff*